```
              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF ARKANSAS
                      HARRISON DIVISION

JOE SAMUEL BAILEY, et al.                              PLAINTIFFS

        v.              Civil No. 05-3014

EFO HOLDINGS, L.P., et al.                             DEFENDANTS
```

### ORDER

Now on this 22nd day of March 2006, comes on to be considered

* **Defendants' Motion to Dismiss or, in the Alternative, To Transfer** (Doc. 13);

* **Plaintiffs' Response** (Doc. 19);

* **Defendants' Reply** (Doc. 22); and

* **Plaintiffs' Surreply** (Doc. 23).

The Court, being well and sufficiently advised, finds and orders as follows with respect thereto:

### Background

1. Plaintiffs Joe Samuel Bailey, Mark Miller, and Ted Suhl (hereinafter either collectively "plaintiffs" or "Bailey", "Miller" and "Suhl", as appropriate) are residents of Arkansas. Plaintiff Laserscopic Spinal Centers of America, Inc. ("Laserscopic"), is a Nevada corporation, which, according to plaintiffs, has its principal place of business in Arkansas.

2. Plaintiffs bring this diversity action asserting state law claims of tortious interference with contract, violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-

101, et seq., defamation, breach of fiduciary duty, conversion, fraud and deceit.

The claims asserted by plaintiffs arise out of the formation and operation of a laser spinal surgery clinic in Florida. Plaintiffs name, as defendants, the following entities and/or persons:

* EFO Holdings, L.P. ("EFO"), a Texas limited partnership;
* EFO Genpar, Inc. ("EFO Genpar"), a Texas corporation that is a general partner of EFO; and
* Dr. James St. Louis and Dr. Michael Perry, Florida residents and shareholders in Laserscopic.

3. Defendants now move to dismiss this action, asserting that the exercise of personal jurisdiction over them would violate due process. In the alternative, defendants move to transfer the action to Florida, arguing that venue does not lie in this district. Plaintiffs resist both motions.

4. To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff "must state sufficient facts in the complaint to support a reasonable inference that [the] defendants can be subjected to jurisdiction within the state. Once jurisdiction ha[s] been controverted or denied, [the plaintiff] ha[s] the burden of proving such facts." Block Indus. v. DHJ Indus., Inc., 495 F.2d 256, 259 (8th Cir. 1974) (internal citation omitted). The plaintiff's "'prima facie showing' must be tested,

not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." Id. at 260.

With the foregoing legal principles in mind, the Court now turns to an examination of the motions under consideration.

5. In plaintiffs' second amended complaint and in affidavits submitted in response to defendants' motion to dismiss, plaintiffs detail their version of the events giving rise to this lawsuit. They say:

\* that, in late 2003, Dr. St. Louis initiated contact with Bailey in Arkansas to discuss the prospects of a joint venture of opening a spine surgery center for advance techniques of minimally invasive spine surgery.

\* that Dr. St. Louis is one of the few surgeons who can perform the spine surgeries and Dr. Perry is an internist familiar with the pre-operation evaluation and post-operation observation for the surgeries.

\* that, in reliance on Dr. St. Louis's representation that he would work for Laserscopic, Bailey began researching opportunities for opening a surgery center in Florida.

\* that Bailey, along with fellow Arkansas resident Suhl, formed Laserscopic, a Nevada corporation that owned four Florida LLC's.

*   that Laserscopic's "corporate offices" were located in Cotter, Arkansas, and it opened its operating bank account in Mountain Home, Arkansas; that corporate communications were mailed, executed, and reviewed in Arkansas; and further that "Arkansas was the site of major corporate decisions, and corporate records were kept in Arkansas."  (Doc. 11 ¶ 24.)

*   that in August 2004, Laserscopic opened a surgery center in St. Petersburg, Florida, with Dr. St. Louis functioning as the surgeon and medical director of the center; and that, while there were communications between the parties regarding the issue, Dr. St. Louis's employment relationship was based on an oral agreement and was never reduced to writing.

*   that Dr. Perry entered into a Professional Services Agreement with Laserscopic Medical Clinic, LLC (one of the Florida limited liability companies owned by Laserscopic) in August 2004; and that the agreement provided that it was to be governed by Florida law and that any disputes regarding it were to be subject to arbitration in St. Petersburg, Florida.

*   that Bailey and Suhl provided the preliminary financing for Laserscopic, but later sought additional financing to enable them to open surgery centers throughout the country.

*   that, in April 2004, Bailey, Dr. St. Louis, and Dr. Perry met in Florida with EFO's Chief Executive Officer, William Esping, to discuss financing and to inspect a site for another surgery

center in Florida; and that, at this meeting, Esping was provided a copy of Laserscopic's confidential business model and financial projections.

\* that Esping thereafter emailed a proposed term sheet to Bailey in Arkansas, offering to provide a 1.8 million dollar line of credit to Laserscopic to start up a surgery center in Naples, Florida; and that the term sheet provided that in exchange for this financing, EFO would hold ownership of the Naples center and would own a 10% interest in Laserscopic.

\* that Laserscopic rejected the proposed term sheet but continued discussions with EFO regarding financing.

\* that, at the request of EFO via email to Bailey in Arkansas, Bailey informed EFO of the current ownership interests in Laserscopic; that the potential patient list exceeded 800 contacts; that there was a meeting with Wal-Mart executives in Bentonville, Arkansas, scheduled in October 2004 to promote Laserscopic becoming a provider under Wal-Mart's health plan; and that EFO subsequently sent Bailey another email, requesting all of Laserscopic's lease agreements, operating agreements, and financial statements, in anticipation of EFO constructing another term sheet for EFO's potential investment.

\* that, according to Bailey,

> [I]n September, 2004, Fred Weaver, our on-site coordinator in Florida, called me numerous times to inform me that he thought something was going on between Dr. St. Louis, Dr. Perry, and EFO Holdings. Mr. Weaver

felt that Drs. St. Louis and Perry and EFO had plans to take over the majority control of Laserscopic Spinal. After talking to Mr. Weaver, I became uncomfortable of the relationship between Drs. St. Louis and Perry and EFO. I knew that Dr. St. Louis had admitted to Mr. Weaver that [a representative of] EFO ... had been in contact with Dr. Louis about Laserscopic Spinal since early 2004 and that EFO was really interested in our company. (Doc. 19 Ex. 2 ¶ 6.)

\* that, in September 2004, Dr. Perry traveled to Arkansas to present a seminar to potential patients.

\* that, in October 2004, Dr. Perry and Dr. St. Louis traveled to Arkansas for the meeting with Wal-Mart executives regarding Laserscopic becoming a provider under Wal-Mart's health plan; that, after the meeting, Dr. St. Louis was supposed to provide the Wal-Mart executives with a book explaining the spine surgeries; and that, according to Bailey, Dr. Louis "stalled" in doing so "because he was having discussions with representatives of EFO about either taking our company over or starting their own." (Id. ¶ 10.)

\* that, soon after the meeting with Wal-Mart, EFO's CEO William Esping advised Bailey to "stop looking elsewhere for funding," and that EFO would seek a 15% ownership interest in Lasercopic and meet the capital needs of the company through a loan.

\* that, on October 27, 2004, EFO emailed a proposed term sheet to Bailey; that, contrary to Esping's earlier representation that EFO would only seek a 15% ownership interest in Laserscopic,

the term sheet proposed a 55% ownership interest for EFO; and that Bailey immediately rejected these terms.

* that EFO subsequently opened its own spinal surgery center in Florida and, according to plaintiffs, "encouraged and induced" Dr. St. Louis and Dr. Perry to sever their employment agreement with Laserscopic and go to work at EFO's competing surgery center.

* that, according to Bailey, EFO, through its agents, contacted Suhl and Miller (who had entered into an agreement to buy Suhl's share in Laserscopic) and also contacted parties doing business with Laserscopic, and made defamatory statements about Bailey to disparage Bailey's business reputation and to disparage Laserscopic; and

* that, as a result of defendants' actions, Laserscopic "is in severe financial difficulty requiring large amounts of cash infusion, dissolution, or reorganization of the corporate structure." (Doc. 11 ¶ 98.)

## Discussion

6. A federal court may assume jurisdiction over nonresident defendants only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause. See Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). Because Arkansas' long-arm statute permits the assertion of jurisdiction to the fullest constitutional extent, see Davis v. St. Johns Health Sys., Inc., 71 S.W.3d 55, 58 (Ark. 2002), the Court's

inquiry is limited to whether the exercise of personal jurisdiction comports with due process. See id.

The due process clause requires there be "minimum contacts" between the defendant and the forum state before the forum state may exercise jurisdiction over the defendant. See Worldwide Volkswagen v. Woodson, 444 U.S. 286, 291 (1980). Sufficient contacts exist when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there," id. at 297, and when "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

The Supreme Court has set forth two theories for evaluating minimum contacts: specific jurisdiction and general jurisdiction.

Specific jurisdiction exists only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984).

General jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts. See id. at 415-16. Because general jurisdiction is not related to the events

giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's "continuous and systematic general business contacts." Id. at 416.

With these considerations of due process in mind, the Court proceeds to an examination of defendants' contacts with Arkansas.

7. **General Jurisdiction as to EFO** -- Plaintiffs say that EFO is subject to general jurisdiction in Arkansas because EFO has an ownership interest and "direct involvement" in three companies that are either located in Arkansas or do a substantial amount of business in Arkansas. Plaintiffs contend that discovery "could show the full extent of EFO's dealing with these Arkansas companies." (Doc. 19 at pgs. 6-7.)

In response, EFO submits affidavits from its officers stating:

* that EFO is a Texas limited partnership that serves as an investment firm for various principals;
* that, while other entities owned by various members of the "Esping family" own a small interest (ranging from 5% to 15%) in the three Arkansas companies cited by plaintiffs, EFO itself only owns less than .5% of the stock in one of the companies;

* that only one or two of EFO's partners sit on the multi-member boards of the Arkansas companies and EFO does not influence or control these companies.
* that no EFO employee ever met with plaintiffs in Arkansas;
* that EFO has no place of business in Arkansas and is not registered to do business in Arkansas;
* that EFO has no offices, inventory, bank accounts, real estate, personal property, employees or agents in Arkansas; and
* that EFO does not advertise or solicit business in Arkansas and it does not concentrate any of its business efforts toward Arkansas.

EFO's mere ownership interest, if any, in the three Arkansas companies at issue is insufficient to establish personal jurisdiction over EFO. Even if an out-of-state corporation wholly owns an in-state corporation, it is not subject to personal jurisdiction in the state unless it "so controlled and dominated the affairs of the [residential corporation] that the latter's corporate existence was disregarded so as to cause [it] to act as the nonresidential corporate defendant's alter ego." Epps v. Stewart Information Servs. Corp., 327 F.3d 642, 649 (8th Cir. 2003). Plaintiffs' general allegation that EFO has "direct involvement" with these companies is insufficient to rebut the

statements in defendants' affidavits or to establish that EFO controlled and dominated the companies to such an extent that the companies acted as EFO's alter ego.

The Court is not persuaded by plaintiffs' assertion that discovery "could show the full extent of EFO's dealing with these Arkansas companies." It would appear that plaintiffs, as the parties dealing with defendants, would be in a position to fully know what, when and where defendants did acts which might subject them to this Court's jurisdiction and they have been free to allege whatever they knew in that regard. Thus, without more than their speculative and conclusory assertion that discovery on the jurisdictional issue is warranted and would produce facts material to that inquiry, such is not warranted. See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 402-03 (8th Cir. 2003).

Based on the foregoing, the Court concludes that EFO lacks sufficient minimum contacts with Arkansas to establish the existence of general personal jurisdiction.

8. **Specific Jurisdiction as to EFO** -- Plaintiffs assert that EFO is subject to specific personal jurisdiction in Arkansas based on two separate theories:

(a) First, plaintiffs say the Court has specific jurisdiction over EFO because the events giving rise to this lawsuit involved

-11-

EFO placing numerous phone calls and email communications to Arkansas residents.

This contention is without merit since such communications are insufficient, alone, to confer personal jurisdiction. See Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1103 (8th Cir. 1996).

(b) Next, plaintiffs argue that EFO is subject to specific personal jurisdiction under the "effects test" established in Calder v. Jones, 465 U.S. 783 (1984).

Under Calder, an intentional tort directed at the plaintiff and having sufficient impact upon the plaintiff in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the minimum contacts prong of the due process test is satisfied. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984).

In the Court's view, Calder is of little help to plaintiffs. The "focal point" of EFO's alleged wrongdoing and harm occurred in Florida -- where Laserscopic's surgery center was located. The fact that Laserscopic is incorporated in Arkansas and may, therefore, have felt the financial effects of the alleged torts in Arkansas, is insufficient to establish personal jurisdiction. See General Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1387-88 (8th Cir. 1993); see also IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265 (3rd Cir. 1998).

Accordingly, the Court concludes that it may not exercise personal jurisdiction over EFO based upon either of the foregoing theories.

9. **Personal Jurisdiction under the Arkansas Deceptive Trade Practices Act -- as to EFO** -- Plaintiffs argue that the following language in the Arkansas Deceptive Trade Practices Act -- under which plaintiffs assert a claim -- establishes that the Court has personal jurisdiction over EFO:

> Every person subject to liability under [this statute] shall be deemed, as a matter of law, to have purposefully availed himself or herself of the privileges of conducting activities within Arkansas sufficient to subject the person to the personal jurisdiction of the circuit court hearing an action brought pursuant to this chapter. Ark. Code Ann. § 4-88-113(d)(3).

The argument does not have adequate reach. The existence of personal jurisdiction under a state statute is only one part of the jurisdictional analysis -- the second part of the analysis is whether the exercise of personal jurisdiction comports with federal due process. See Stevens v. Redwing, 146 F.3d 538, 543 (8th Cir. 1998).

As detailed above, EFO lacks sufficient minimum contacts with Arkansas to satisfy federal due process requirements. Accordingly, this argument for personal jurisdiction over EFO is also without merit and must be rejected.

10. **EFO Genpar** -- Plaintiffs assert that EFO Genpar, as a general partner of EFO, is liable for the debts and obligations of

-13-

EFO and, therefore, that the Court must "treat the Arkansas contacts of EFO Holdings as being contacts for EFO Genpar." (Doc. 19 at pg. 18.)

Even if the premises be granted (and the Court deems it unnecessary to decide the question), the Court has concluded that EFO lacks sufficient minimum contacts with Arkansas for the Court to exercise jurisdiction over it. Thus, the issue is moot as to EFO Genpar on the argument made.

11. **Dr. Perry and Dr. St. Louis** -- Plaintiffs assert that this Court has specific jurisdiction over Dr. Perry and Dr. St. Louis because they had employment contracts with Laserscopic in Arkansas; they made phone calls and sent emails regarding the company's business to Arkansas; and they traveled to Arkansas to promote the surgery center and solicit Wal-Mart's business.

Dr. St. Louis had no written employment agreement with Laserscopic. Dr. Perry did have a written employment agreement; however, it was not with plaintiff Laserscopic but with Laserscopic Medical Clinic, LLC, one of the Florida limited liability companies owned by Laserscopic. Further, Dr. Perry's written employment agreement provided that it was to be governed by Florida law and that any disputes regarding it were to be subject to arbitration in Florida. Merely entering into a contract with a forum resident does not provide the requisite contacts between a nonresident defendant and the forum state. See

Bell Paper Box, Inc. v. Trans Western Polymers, Inc., 53 F.3d 920, 922 (8th Cir. 1995).

With regard to the phone calls and email communications to Arkansas, as discussed above in relation to EFO, such communications are insufficient to confer personal jurisdiction. See Burlington, 97 F.3d at 1103.

Dr. Perry's two visits to Arkansas and Dr. St. Louis's one visit to present a seminar about the surgery center and to meet with Wal-Mart executives are also insufficient to establish personal jurisdiction. See Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 226-27 (8th Cir. 1987) (contacts insufficient for jurisdiction even though defendant made visits to forum state); Amana Refrigerations, Inc. v. Quadlux, Inc., 172 F.3d 852, 857-58 (Fed. Cir. 1999) (applying Eighth Circuit law and concluding that defendant's contacts with forum state were insufficient to support exercise of jurisdiction where defendant visited the state on only two occasions and had solicited sales through national publications).

The Court, therefore, concludes that these contacts with Arkansas by Dr. St. Louis and Dr. Perry are insufficient to confer personal jurisdiction over them.

## Conclusion

12. Based on the foregoing, the Court concludes that it lacks personal jurisdiction over all of the named defendants.

Accordingly, **Defendants' Motion to Dismiss (Doc. 13)** should be granted and plaintiffs' complaint should be dismissed.

13. Defendants' alternative **Motion to Transfer** (incorporated in its **Motion to Dismiss (Doc. 13)**) is rendered moot by this Order.

**IT IS, THEREFORE, ORDERED that** Defendants' **Motion to Dismiss (Doc. 13)** be, and it hereby is, **granted** and plaintiffs' complaint is **dismissed.**

IT IS SO ORDERED this 22nd day of March 2006.

/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE